Case 23-5606, Danny Hensley v. Heather Bossio et al. Argument not to exceed 15 minutes per side. Council, when you're ready, you may proceed with the appellate. May it please the court, my name is Aaron Bentley. I'm here representing the appellate, Danny Ray Hensley, as the administrator of his son's estate. I've reserved three minutes for rebuttal. Your Honors, I'm not here today because we got a couple of bad rulings that I disagreed with and it made my job harder at trial. The reason I'm here today is because after the magistrate judge was assigned to this case, we received adverse ruling after adverse ruling, all in which the magistrate either used the wrong legal analysis, misapplied the right legal analysis, or took a clearly erroneous view of the facts. Consequently, as a result of those rulings, the defendants ended up with rulings that all the most inflammatory, prejudicial evidence was admissible, and I was left, my client was left, without an expert to rebut any of that evidence. Now despite all that, we were able to get a mixed verdict at the trial. The jury found on liability in favor of plaintiff, and on causation in favor of defendant Maggard. Notably, that was without my expert, who would have testified on the causation issue. So this is a case like this court's decision in Beck v. Haig, where the magistrate judge made so many crucial errors that the court is left without being able to say with fair assurance that the outcome of the trial wasn't altered by those errors. In Beck, this court identified two categories of errors. One, those with a significant potential to persuade the jury. Can I start with a question there? Please. So I'm struggling with what to do about your expert's testimony about the requirements of the Prison Rape Elimination Act. And the reason is, it seems to me, correct me if I'm wrong, but it seems to me the undisputed evidence is that the prison itself interpreted that act to only require high-risk abusers and high-risk victims to be in different cells, and not to be in different dormitories. Now I understand your expert would have testified that the act should require also different dormitories. But it strikes me that if I'm the defendant here, is it Bozio, is that how you pronounce the name? Bozio.  If I'm Bozio, I'm going to be following the prison rules. And it strikes me as somewhat unfair to her to require her to follow a different interpretation of the Prison Rape Elimination Act. If you disagreed with the prison's interpretation, why wouldn't you sue the individual responsible for that interpretation rather than her? Do you get my point? It seems to me you're trying to suggest that she should have violated her own prison rules and followed your expert's interpretation. And it strikes me that that's just a step too far maybe. I do understand what you're saying, Judge Murphy. My response is that it's not that I want her to follow my expert's interpretation. It's that I wanted her to follow what the rule says. The rule says they have to be kept separate. What does the word separate mean? It can't mean that opposite-risk inmates can end up in the same cell together. It can't mean that. And the FAQs from the PREA Resource Center that my expert would have talked about discuss if they have to be in the same dorm together, then there has to be heightened supervision. And there's no evidence of heightened supervision related to opposite-risk inmates in this case. But I think this is either the point Judge Murphy's getting at or the one I want to get at. I'm not sure which. But it seems to me, I looked at your expert's testimony, and the best I can recall, he was giving what was his interpretation of the statute's requirements. But they're not explicit in the statute. As you mentioned, it only requires separation. And whether that's separate cells or separate dorms is not specified, right? I would disagree with that, Your Honor. I think the ‑‑ Where's the language? You didn't mention any language about separate dorms. You just said separate. That's in the FAQ that comes from the PREA Resource Center, which not only my expert, but C.A. Wilkerson, who's the former statewide PREA coordinator in Kentucky, acknowledged that that is considered widely accepted in the industry of corrections. And then back to Judge Murphy's question, well, if that is so, why should this individual who is not the policymaker be faulted for an interpretation that's inconsistent with the policy of the prison in which she works, however misguided that policy might be? Well, the reason is that everyone has a duty to follow the rules. Everyone. The rule says to keep them separate. Let's ignore the FAQ for a second. The rule says to keep them separate. How can the common sense understanding of separate mean that there's a way for these two to get in the same cell together? How can it possibly mean that? And Ms. Basio, specifically that morning, was put on notice that they were trying to get in the same cell together, that they had opposite risk classifications, that Bowman, the older inmate, was looking out for Hensley, the younger inmate. She had everything in front of her, as the district court found before this case was assigned to the magistrate judge. She had everything in front of her to have subjective knowledge that there was a risk. And that doesn't even, you know, you can ignore keeping separate at that point. She told them it was okay to share a cell. No, she told them it was okay to spend time together, which the FAQ makes clear that's not correct. It's simply not. My expert would have testified to that. They weren't supposed to spend time together. Even if there's a common yard anywhere, they can't be in the common yard at all? So your point is that they have to be in completely separate areas of the prison at all times? No, if they're going to be in the same area, there has to be heightened supervision. That's my point. But what do you, I still, you just, is your view that she had a duty under this act to disregard the prison's interpretation of the PREA? No, Your Honor. My view is that she had a duty to keep them separate. But you, we're just talking past each other because she, under the prison's interpretation of keep them separate, she fulfilled her duty because she told them that they have to be in separate cells, and that's the way the prison interpreted separateness. But then after that, she became aware of more of a risk. If she had never become aware from that meeting that morning of what was happening between these two inmates, I wouldn't have a claim against her whatsoever. She would know nothing except for their risk classifications. She wouldn't know that on top of that there's all this other stuff that's going on. But she did. She knew there was more. She didn't report that interaction. She didn't make a note of that interaction. She didn't do anything. But I really want to get more to the trial issues, unless Your Honor has more questions about that, because the Basio issue relate to the directed verdict, the directed verdicts that were granted. But I want to talk about the errors with the trial because, you know, I wasn't allowed to have an expert. First, I tried to have him testify remotely because he had a large change in his life where his mother was unable to, you know, do the independent daily activity, whatever it is, activities of daily living. And Cam Lindsey was the only family member in the area that could care for her. So I tried to have him testify remotely. Two occasions, the court never analyzed Rule 43A. The magistrate judge never analyzed that rule. There was never a finding that I didn't comply with Rule 43A. It was simply no real legal reasoning why I shouldn't be able to have him testify remotely. Then he was excluded, and I believe that was a misapplication of Rule 26. He did disclose his opinions, reasonably elaborated upon those in his deposition. There was no identification of prejudice to the defendants with him being able to testify. It was just called an unfair surprise. And then on the morning of trial when the magistrate judge suddenly announced that I could call Mr. Lindsey live, which I don't think was only a shock to me. The defendants' counsel in the record said that it was his understanding, and Lindsey had been completely struck as a witness. So I don't think anybody thought I could call him live. So I asked for a continuance, and I get no legal reasoning why the continuance is denied. Usually that's within the magistrate's discretion, of course. But there does have to be a rational explanation. What procedural route did you get to this trial before the magistrate judge as opposed to in the district court? I'm just curious. Well, Your Honor, we were before Judge Wilhoite in the district court, and in 2019 we went to a pre-trial conference. I thought we were getting a trial date. Instead, the judge invited the defendants to file a motion for summary judgment, even though they had failed to comply with the first deadline. They again blew that deadline. Then COVID came, and we kept having new pre-trials that kept being set and reset. Then I get a call twice from one of Judge Wilhoite's clerks saying, Judge Wilhoite is not going to be able to try this case. Your options are going to a magistrate judge. I declined that at first because I didn't want to do that. By this time, we went from 2019 to 2023. I had no choice but to accept the magistrate judge assignment, so I did that. Is there a problem with that procedure? I'm sorry? Is there a problem with what happened there? I don't want to suggest other issues. Never mind. Yeah, I think there's a huge problem, Your Honor, but I have a brief. I hate to say it, but isn't that a pretty valid reason to deny the continuance? I thought the magistrate judge, for whatever reason, this case has dragged on for many years. It doesn't strike me as an abuse of discretion to say, I'm not going to grant another continuance because this case has been going on for way too long. Why would that be an abuse of discretion? Well, there was no finding regarding the prejudice to either party. There was no finding of whether a continuance would allow for additional evidence or witnesses. That's what is required on a motion for continuance. And clearly, the continuance would have resulted in additional evidence and witnesses. I thought, is some of your arguments inconsistent with each other? Because you wanted the continuance to bring your expert in live, but then you earlier said that your expert couldn't come in live. He couldn't. That would have given me the opportunity to exhaust every available avenue. If I had to hire care for his mother or something, but yeah, to exhaust every possibility. Do you have a duty, you think, to show prejudice by putting in evidence that it's likely that he would have been able to come? That wasn't even asked, Your Honor. It was simply denied off the top. I see that my time has expired. I'll reserve the rest of my time for rebuttal. Would it please the Court, Counsel, Judge Murphy has kind of stolen my thunder on a lot of the issues that I wanted to talk about with regard to Priya and the very problem that Ms. Basio would face when she's asked a question, can we be cellmates? And her testimony was, she's asked that question frequently, not just by, this wasn't the first time it happened, probably wouldn't be the last time that it happened, that somebody that was a high-risk abuser and a high-risk victim were going to say, yeah, I know that's the rule, but if it's okay with us, can we be in a cell together? And she says, no. The policy that's adopted for separation to comply with Priya is, they cannot be housed in the same cell, but they can associate with one another in the common area, in the chow hall, out on the yard, and things like that. And that's not just an interpretation by the Kentucky Department of Corrections. Priya compliance and noncompliance has an effect on funding. That's the mechanism that's built in. It is completely voluntary upon the states, unlike what Mr. Lindsay would have testified to, because he worked in the federal system, and of course Congress could pass Priya and make it applicable to the Bureau of Prisons. They could not do the same thing to the states. Kentucky voluntarily participates in that program, and in order to assure compliance, they are required to have their systems audited. Audited by trained auditors approved by the Department of Justice that go around and do an audit every three years to make sure that your policies and procedures are in compliance with the requirements of Priya so that you are able to receive the funds. The local prison makes a determination of whether or not it's compliant with Priya based on the facilities that it has and the inmates that it has. So I guess one question I have in this case was, why weren't these inmates put in separate dorms completely? Well, one of the problems that you have with this, and this case kind of illustrates it, is there are two assessments that are done. One assessment determines whether you're a high-risk victim. The other assessment determines if you're a high-risk abuser. Mr. Bowman was classified as a high-risk abuser. Mr. Hensley was, in fact, classified as both. So now we run into the situation of Mr. Hensley can't be in a cell with a high-risk victim, and because he's a high-risk victim, he can't be in a cell with a high-risk abuser. So we have the physical plant. That's what the auditors actually come and do. The audit by Priya is not a paper audit. It's a three-day intense visit to the facility to look at the physical plant. I take it there's nothing in the record to suggest that there was a violation of Priya by putting them in the same building together to begin with. No. The testimony from Mr. Wilkerson, who's the statewide person. I think his allegation is that she, Basio, received some information that there was a risk. Well, her information was they came and asked a question. Notwithstanding our, you know, we think we're a high-risk victim and high-risk abuser, the inmates, in fact, are not told. Though they can generally, particularly when they've been in there, can kind of take a guess as to which one they are. They said, if that's the case, could we still be cellmates if we want to? And what she does is explain to them exactly what the policy is. So she tells them no. She says, no, you can't be in the cell, but the policy is... Is that because of her involvement in anything? She can't do the cell moves. So what she did was, she said, I'll make a note that you've asked, because she doesn't want to confirm what their conjectures are. I'll make a note and ask if that's something that can be done. And that's handled by Lori Connolly, who was a defendant, but they have not appealed the grant of... She communicated that to Connolly? No, she never even had a chance to communicate it to Connolly. She wrote it on a Post-it note. So their theory is that she should have communicated that to Connolly, who then would have told Maggard, I guess. Well, I don't know what... I'm trying to figure out what the tie is, what Connolly did or didn't do to the final harm. Well, she informed them of the rule and said she would bring up the issue with Connolly that they wanted to be in the cell together. Of course, she doesn't... She didn't have anything told to her that there was a risk that someone's going to try to do something to somebody else, try to kill them or anything. No, her understanding is that they were friendly with each other. So she's got no indication that anybody wants to harm anybody at all. In fact, her understanding as she leaves that interaction is that they're friends with one another. Can I ask just how... Is it a statewide interpretation of PREA that it's only cell separation that is required, or is it a prison by prison? So if a prison had the more ability to separate from dorms, you might say that it's even broader. Well, what I know is that the same separation policy is used in all of the different facilities. Now, I imagine if... And they've continued to get PREA funding. Right. And in fact... That might have gone... The fact of the funding, had the evidence from the expert been heard, might have been counter to his opinion about what the Act required. I mean, we're conjecturing about something that didn't happen because he didn't testify. Well, but here's the other issue. When I asked for him to be excluded, I didn't ask just on the grounds that there wasn't a proper disclosure of PREA. I took the position he's not an expert on PREA at all because he retired before the standards were adopted. He has never had any PREA training. He is not trained as an auditor. He's talking about a policy that's not just approved by the Department of Correction, but by the actual trained experts that the Department of Justice relies on to say that we're compliant. If it's the position that our people can be sued when we're in compliance with what the auditors say, and it's a voluntary program, I'd have to go back and tell the commissioner, you need to send a letter tomorrow to tell the Justice Department we'll forego the 5%. We're done with PREA. And my understanding is not a lot of... There are a substantial number of states who have decided to do that because the financial penalty is less than the cost of running the audit program and all of the other things that they have to do. So a finding that she could be held liable just for saying the rules is going to have exactly the opposite effect on PREA because it's going to make more states reconsider whether they want to be involved in it. Who was the... Is there a particular policy maker within Kentucky that sets the standards that would potentially be the appropriate party to... Well, these are done through administrative regulations, and actually in Kentucky what has to happen is we would write the administrative regulation and it has to go before a legislative review committee in order to be approved as a regulation. So in the Department of Correction, no one really has the authority to implement this thing by themselves. But what happens... Suppose just a hypothetical... Kentucky just adopts a blatantly atextual interpretation of PREA, and that blatantly atextual interpretation leads to two inmates being in the same cell and they shouldn't be. Presumably there would be somebody who would be the appropriate party to sue, and I would think it would be the party who adopted the erroneous interpretation of the statute. The problem I have here is it's obviously not Mrs. Basio, but I would think that there could be a claim if we thought the interpretation of PREA was wrong that you could sue somebody, and then that interpretive question would come before us and judges decide legal questions like that all the time. And we do failure to protect cases all the time just normally under the Eighth Amendment that don't really involve PREA. So I think under that situation it would just be a normal Eighth Amendment claim that two people were put in the cell. Because of course PREA, the problem in response to your question, Judge Bush, is PREA is one way we have to divide the population up. But that's not the only way we have to divide the population up. We have security threat groups, so we have to be aware of gang members and gang affiliations and all of this stuff. And even the plaintiff's expert, Mr. Lindsey, said figuring out how you house these people safely is a very complicated kind of thing and there's no fixed formula that you could do to resolve this. Now, I'd like, if you're satisfied with the PREA issue, I would like to move on and talk about why I don't think even if Mr. Lindsey would have testified, he could have gone to the issue of causation. I wanted to, if you don't mind, I can focus that. So I wonder if the court's exclusion altogether of Lindsey was overbroad because Lindsey would have testified about Maggard and how Maggard should have entered the cell once he saw the towel over the window. And I don't think that has anything to do with PREA. He was just stating the standard of care of a correctional officer when he sees a violation like that. So why would you, if you thought that the reason to exclude the expert as he's testifying about PREA and it wasn't disclosed, why wouldn't the remedy be a narrow remedy, don't allow for PREA stuff, but you can allow for this other stuff that has nothing to do with it? Well, because there's an additional reason that I had asked that he not be included. Because not only did he not disclose PREA, if you read his report, he didn't have any opinions about anything. Because his report says, I'm sure when we do discovery, we're going to find things, and I'll have an opinion about those when that happens. And I specifically asked him, why aren't all your opinions in here? And he said, well, I didn't have all of the information that I needed to formulate my opinions, so I wrote a preliminary report because that's what plaintiff's counsel asked me to do. And he admitted that it was incomplete and didn't disclose things. He's talking about what he would come up with in the future. But the one thing I did ask him about that goes directly to the issue of causation is, did you have any opinion about when Mr. Hensley died? Because in order for any negligent act to have caused Mr. Hensley's death, that act has to occur before Mr. Hensley is dead. They were in the cell for 40 minutes. There's absolutely no information in the record about when he died. Plaintiff offered no evidence about when he died. He could have died one minute after they went in the cell. He could have died 10 minutes after he went into the cell. We don't know on the record here. But why is that relevant to the claim against Basio? Well, that's not. That has nothing to do with Basio. It's strictly the jury verdict saying that Maggard did not cause the death because we don't know when Mr. Hensley died. Why wouldn't that be a jury question? And it was a jury question, and it went to the jury, and the jury found in the favor of Mr. Hensley. What do you make of Lindsay? I'm looking at page 54 of the blue brief. Suggests expert Lindsay opined that by entering the cell, Maggard, quote, could have stopped this from happening, end quote. That could have been useful testimony on causation, I would think. Well, but only if entering the cell, he's still got to be alive. And you would have to have some factual testimony about the interaction of the two men with each other before that expert opinion would be relevant, right? Right. And there is information, and that information was provided to the expert because the police report from the state police of the murder was provided to you. No? No. The thing was on videotape. You could see the entry into the cell. You could not see what occurred in the cell. Well, Maggard's inaction may or may not have made a difference. I mean, it is kind of a red flag if you see a towel up like that in a prison setting. But without some proof to establish that it could have made a difference, it wouldn't have mattered. Right. It's just conjecture. I'm done. Thank you. Have a rebuttal. Your Honors, there was evidence that it mattered because Mr. Maggard's testimony was that 18 minutes before he found Hensley dead, naked, lying face down in a pool of blood, he looked over the towel into the window and saw nothing out of the ordinary. I asked him, is there anywhere in that cell a dead or a body could have been, dead or alive, that you wouldn't have seen? No. So we know that 18 minutes prior, Danny Oscar Hensley had to have been alive based on Maggard's testimony. Did Maggard see the two individuals? He said all he would say is he saw nothing out of the ordinary. So Danny wasn't being strangled. He wasn't naked. There wasn't blood in the cell. He saw nothing out of the ordinary. I found his testimony quite vague. Did he testify that he told them to take the towel down and that the towel was actually taken down? He tried to testify to that until I reminded him of his earlier testimony that he did not do that. So is your point of view that it is not undisputed? It is undisputed that he didn't do anything. Well, it's not undisputed because he actually testified that he told them to take it down. Yeah, but then when I reminded him that that was not correct with his previous testimony and I showed him the video where he didn't do that, he had to admit that he was wrong about that. So you see it on the video. He gets up on his tiptoes, looks over the towel. His testimony was there's nothing he couldn't have seen in that cell and there was nothing out of the ordinary when he looked in. And yet 18 minutes later, Danny Hensley is naked, lying face down, dead in a pool of blood. Something happened within those 18 minutes. Cameron Lindsay would have testified that his job was to go in the cell when he saw the towel covering the window. And the defendants agreed with that. The defendants admitted that the rule is there can't be a towel. You've got to go in. You knock on the door, open the door, go in. You find out what's happening. Paul Holbrook testified if you see two inmates in a cell, you don't know whether they're supposed to be cellmates. What would your expert have added to this, given that you already had this evidence in the record that they had a duty? What he would have added to it is he's a former Federal Bureau of Prisons warden who would have said this is how you do things in a prison. This is what you do. On our jury, there was a former Federal Bureau of Prisons official. Sorry, I didn't know he would have added to the duty. This is what you do. That's like breach of duty. How would he have added to causation? Because he would say had he, Maggard, had Maggard opened the door, knocked, opened the door, and went in, then the window's not going to be covered anymore. And then is Bowman going to murder Hensley with the wide open? There's a reason he put the covering up. It would really be at that point speculation whether the removal of the towel made a difference if nobody saw anything or heard anything. You would think that that kind of murder would somehow attract attention despite the presence of the towel. They weren't supposed to be in the cell together, Your Honor. I understand that. I'm saying once he entered, he could have moved them out of the cell because they're only supposed to be cellmates in cells, and Paul Holbrook, who is a prison official, testified if you see two inmates in a cell, you don't know who they are, you check the roster and make sure they're supposed to be cellmates. Your time is up. Yes, it is. Thank you very much. We appreciate the argument you gave. We'll consider the case carefully.